**Slip Op. 05-29**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| TIANJIN TIANCHENG PHARMACEUTICAL CO., LTD.,<br><br>     Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>     Defendant. |

BEFORE: Pogue, Judge

Consol. Court No. 03-00654

**PUBLIC VERSION**

[Plaintiff's motion for judgment on the agency record denied; judgment entered for Defendant.]

Decided: March 9, 2005

Lafave & Sailer LLP (Francis J. Sailer & Arthur J. Lafave III), for Plaintiffs.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; James K. Lockett, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

## OPINION

**POGUE, Judge:** This action requires the Court to review certain determinations in the "new shipper" review of Plaintiff's imports of glycine from the People's Republic of China. Defendant, the U.S. Department of Commerce ("Commerce"), rescinded its review of Plaintiff's imports after concluding that the sale upon which

the review was based was not <u>bona fide</u>. Because the Court finds

that Defendant's conclusions are supported by substantial record

evidence, the Court denies Plaintiff's motion and enters judgment

for Defendant.

**BACKGROUND**

Commerce published an antidumping duty order on glycine from

the People's Republic of China in 1995. <u>Glycine from the People's</u>

<u>Republic of China</u>, 60 Fed. Reg. 16,116 (Dep't Commerce Mar 29,

1995) (antidumping duty order).  An exporter may request a "new

shipper review" of its products that are subject to an antidumping

duty order if it began shipment of the products after the order was

imposed.  <u>See</u> 19 U.S.C. § 1675(a)(2)(B) (2000).  This statute

enables the new shipper to demonstrate that it should be accorded

a dumping rate specific to itself, and not the "all-others" rate,

which is usually higher than a firm-specific rate would be.

In this case, Commerce received a request for a new shipper

review from Plaintiff on March 29, 2002.  Plaintiff refiled its

request on May 1, 2002, after having been informed by Commerce that

its original request did not comply with the applicable statutes

and regulations. <u>See</u> Pl.'s Conf. Mem. Supp. R. 56.2 Mot. J. Agency

R. at 2-3 ("Pl.'s Conf. Br."); Final Results of Determination

Pursuant to Court Remand ("Remand Determ."), CRR Doc. No. 13 at 2

(Apr. 23, 2004).[1]

In response to a Commerce questionnaire issued pursuant to the new shipper review, Plaintiff indicated that on January 25, 2002, it sold 1000 kilograms of glycine to a U.S. importer of pharmaceuticals, denoted here for confidentiality purposes as Company X. The goods were sold at a price of [    ][2] per kilogram, and the accompanying customs documentation did not indicate that the goods were subject to antidumping duties. See Additional Copy of CF 7501, Sales Contract, Exs. S-1 & S-3 to Response of Tianjin Tiancheng Pharmaceutical Co., Ltd. to the Supplemental Questionnaire in the New Shipper Review of the Antidumping Duty Order on Glycine from the People's Republic of China, Attach. to Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re: First Supplemental Questionnaire Response of Tianjin Tiancheng Pharmaceutical Co. Ltd. in the New Shipper Review of Glycine from the People's Republic of China, CR Doc. No. 11 (Dec. 9, 2002).

---

[1]The record in this case consists of the record amassed by Commerce prior to its first, voluntary remand, see infra p. 6, in both public and confidential formats, and the supplemental record which was created during the voluntary remand. The Court will cite to documents in the pre-remand record's confidential version as CR, followed by the document number. The Court will cite to documents in the confidential versions of the record on remand as CRR, followed by the corresponding document number.

[2]Throughout this opinion, brackets designate information held confidential by the parties and thus not publicly divulged by the Court.

    In response to a supplemental questionnaire, Plaintiff disclosed that although payment on the sale to Company X had been due one month after the date of sale, the payment was not made until over nine months later. See Pl.'s Conf. Br. at 23-24. This was confirmed by Commerce during verification procedures. See Memorandum from Matthew Renkey & Scott Fullerton, Analysts, Office of AD/CVD Enforcement VII, to The File, Re: New Shipper Review of Glycine from the People's Republic of China: Sales and Factors Verification Report for Tianjin Tiancheng Pharmaceutical Co., Ltd., CR Doc. No. 19 at 5 (Mar. 6, 2003). Commerce also ascertained that Company X had previously purchased products other than glycine from Plaintiff for importation. See id. Finally, Commerce learned that during the period corresponding to Plaintiff's sale into the United States, Plaintiff had sold the same product to a third-country market for [     ]. See October 10, 2001 Invoice, Spot Checks of Other Sales, Ex. 7. to CR Appendix 1.

    Commerce then issued questionnaires to Plaintiff's importer, Company X. See Glycine from the People's Republic of China, 68 Fed. Reg. 49,434 (Dep't Commerce Aug. 18, 2003) (notice of rescission of antidumping duty new shipper review). The responses confirmed that the January 25, 2002 invoice was paid nine months after the invoice date. See Bank Statement 11/01/02 - 11/29/02, Attach. B to Glycine from PRC (A-570-836) Questionnaire Response, CR Doc. No. 25 (April 28, 2003) (showing that an international

funds transfer from Company X to Plaintiff was made on Nov. 22, 2002.) Company X also reported that it had been late in making payment to Plaintiff on previous occasions, but that this transaction represented the longest delay. See Glycine from PRC (A-570-836); Questionnaire Response, CR Doc. No. 35 at Answer 3 (July 17, 2003). In response to questions about Customs irregularities, Company X averred that it had improperly filed documentation because its broker was unaware of the antidumping duties on the goods. Id. at Answer 2.

On August 18, 2003 Commerce rescinded Plaintiff's new shipper review. Commerce stated that it was taking this action because the questionnaire responses from both Plaintiff and its importer indicated that the sale upon which the review was based was not bona fide -- that is, it was not typical of normal commercial transactions in the industry. Commerce based its finding that the sale was not bona fide on four considerations: (1) the price at which the goods were sold was not "commercially reasonable," (2) the sales were made outside Plaintiff's normal U.S. sales channels, (3) the extent to which late payment was made by Company X, the importer, and (4) inconsistencies in the import documentation. See Glycine from the People's Republic of China, 68 Fed. Reg. 49,434, 49,435 (Dep't Commerce Aug. 18, 2003) (notice of rescission of antidumping duty new shipper review).

Plaintiff consequently filed suit, seeking review of the

determination to rescind the new shipper review.  See Remand Determ., CRR Doc. No. 13 at 4 (Apr. 23, 2004).  Plaintiff challenged Commerce's use of factual information upon which the parties had had no opportunity to comment in the determination to rescind.  Id. at 4-5.  On November 19, 2003, Commerce requested that the Court remand the determination so that the record could be reopened to allow the parties to comment on the two new pieces of factual information: (1) publicly available U.S. Customs and Border Protection ("Customs") data on average unit values for glycine and (2) proprietary data from a Customs query regarding U.S. imports of glycine from the People's Republic of China.  Id. at 5.

After hearing comments and rebuttals from the parties, as well as after issuing a new questionnaire to Company X, Commerce issued a new determination.  See id. at 34-35.  In this new determination, Commerce found that Plaintiff's sale had not been bona fide for the same reasons stated in its earlier determination, except that Commerce now found that the sale had been within Plaintiff's normal U.S. sales channels.  Id.  Commerce still maintained, however, that the price, payment timing, and import documentation all revealed a sale that was not reflective of "normal commercial realities," such that it was not "a reliable indicator of future activity."  Id.  Therefore, Commerce found that the sale was not bona fide for purposes of a new shipper review.  Id.

Plaintiff now challenges this remand determination before the

Court.

## STANDARD OF REVIEW

This Court reviews Commerce's determinations in antidumping duty proceedings, including new shipper reviews, to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(I)(2000).

## DISCUSSION

In conducting a new shipper review, Commerce is essentially conducting a new antidumping review that is specific to a particular producer.  To conduct such a review, Commerce must determine the "normal value and export price (or constructed export price) of each entry of the subject merchandise." See 19 U.S.C. 1675(a)(2)(A).  However, pursuant to the rulings of the Court, Commerce may exclude sales from the export price calculation where it finds that they are not bona fide.  A sale is not bona fide, and therefore may be exluded from export price, where it is "unrepresentative or extremely distortive." See Am. Silicon Techs. v. United States, 24 CIT 612, 616, 110 F. Supp. 2d 992, 995 (2000) (quoting FAG U.K. Ltd. v. United States, 20 CIT 1277, 1282, 945 F. Supp. 260, 265 (1996)).  Accordingly, where a new shipper review is based on a single sale, exclusion of that sale as non-bona fide

necessarily must end the review, as no data will remain on the export price side of Commerce's antidumping duty calculation.

To determine whether a sale in a new shipper review is "unrepresentative or extremely distortive," and therefore excludable as non-bona fide, Commerce employs a "totality of the circumstances" test, see Memorandum from Joseph A. Spetrini, Deputy Assistant Sec'y for Imp. Admin. Group III, to James J. Jochum, Assistant Sec'y for Imp. Admin., Re: Glycine from the People's Republic of China: the Bona Fide Issue in the New Shipper Review of Tianjin Tiancheng Pharmaceutical Co., Ltd. ("Bona Fide Memo")[3], CR Doc. No. 39 at 3 (Aug. 8, 2003), focusing on whether or not the transaction is "commercially unreasonable" or "atypical of normal business practices."  See Freshwater Crawfish Tail Meat from the People's Republic of China, 68 Fed. Reg. 1,439, 1,440 (Jan. 10, 2003) (notice of final results of antidumping duty new shipper review, and final rescission of antidumping duty new shipper review); see also Remand Determ., CRR Doc. No. 13 at 34 (Apr. 23, 2004) (finding that the sale was not reflective of "normal commercial considerations"); Bona Fide Memo, CR Doc. No. 39 at 3 (Aug. 8, 2003) (finding that the value of and practices surrounding the sale were "atypical of normal, commercial transactions in the

---

[3]This memorandum was incorporated by reference into Commerce's original detetermination. See Glycine from the People's Republic of China, 68 Fed. Reg. 49,434, 49,435 (Dep't Commerce Aug. 18, 2003).

industry"). In evaluating whether a sale is commercially reasonable or not, Commerce has considered, <u>inter alia</u>, such factors as (1) the timing of the sale, (2) the price and quantity, (3) the expenses arising from the transaction, (4) whether the goods were resold at a profit, (5) and whether the transaction was at an arms-length basis. <u>See</u> <u>Am. Silicon Techs. v United States</u>, 24 CIT 612, 616 110 F. Supp. 2d 992, 995 (2000); <u>see also</u> <u>Windmill Int'l Pte., Ltd. v. United States</u>, 26 CIT 221, 224-25, 193 F. Supp. 2d 1303, 1307 (2002). However, because the ultimate goal of the new shipper review is to ensure that the U.S. price side of the antidumping calculation is based on a realistic figure, any factor which indicates that the sale under consideration is not likely to be typical of those which the producer will make in the future is relevant. <u>See</u> <u>id.</u> Otherwise, the producer may unfairly benefit from an atypical sale to obtain a lower dumping margin than the producer's usual commercial practice would dictate. <u>See</u> Memorandum from Richard W. Moreland, Deputy Assistant Sec'y, Group I, to Faryar Shirzad, Assistant Sec'y for Imp. Admin., Re: <u>Issues and Decision Memorandum: New Shipper Review of Clipper Manufacturing Ltd.</u>, available at http://ia.ita.doc.gov/frn/summary/prc/02-6076-2.txt (last accessed Feb. 28, 2005) (incorporated by reference into <u>Fresh Garlic from the People's Republic of China</u>, 67 Fed. Reg. 11,283, 11,283 (Dep't Commerce Mar. 13, 2002) (final results of antidumping administrative review and rescission of new shipper

review.)

Turning to the particular sale at issue here, Plaintiff argues that Commerce's determination that its sale to Company X was not typical of its future sales to the U.S. is unsupported by substantial evidence. Specifically, Plaintiff argues that Commerce has not demonstrated, by substantial evidence, that (1) the price of its sale was atypical, (2) that the payment timing demonstrated that the sale was atypical, (3) that the inconsistencies in the import documentation demonstrate that the sale was atypical, or (4) that even to the extent that all three factors are shown, they constitute substantial evidence to support the determination that the sale was non-bona fide. The Court will address each contention in turn.

**1. SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S DETERMINATION THAT THE PRICE OF THE SALE SUPPORTED A FINDING THAT THE SALE WAS ATYPICAL.**

In making its determination on the bona fide issue, Commerce relied on its finding that the price at which the product was sold was not typical of industry practice or of Plaintiff's own pricing practices. See Remand Determ., CRR Doc. No. 13 at 4, 34 (Apr. 23, 2004). The Court will first review the data with which Commerce supported its finding, and then consider Plaintiff's arguments that these data do not constitute substantial evidence, or ignore other contradictory evidence.

To support the finding that the price charged by Plaintiff to

Company X was not a typical or commercially reasonable one, Commerce first looked to data from Customs that showed the monthly Average Unit Values ("AUV") for imports of glycine from China for the year previous to Plaintiff's sale. See id. at 16-17, Bona Fide Memo, CR Doc. No. 39 at 3-4 (Aug. 8, 2003). After discounting the AUV for October of 2001 as an obvious outlier,[4] Commerce averaged the monthly prices, including the AUV for the month in which Plaintiff imported its goods, to calculate a yearly average of $2.27 per kilogram for Chinese glycine. See POR Glycine Imports from China, Attach. 1 to Bona Fide Memo, CR Doc. No. 39 (Aug. 8, 2003). The price of the sale under consideration was [    ] per kilogram, significantly higher than the AUV.[5]  Id.

Having found that Plaintiff's sales price did not appear to be

---

[4]The Court notes that while the particular value that Commerce threw out was in this instance so substantially greater than the other monthly prices as to appear to be an obvious outlier, a simple modal analysis would have allowed Commerce to show its reasons for disregarding that month's value with greater precision. See Laurence C. Hamilton, Data Analysis for Social Scientists 78-82 (Duxbury Press, 1996). Furthermore, such an analysis would have shown that, given how tightly clustered the monthly AUVs were, the value for March of 2001 was also an outlier, and should have been excluded from the average. Exclusion of this value as an outlier would have driven the average yearly AUV down still farther, to $2.21. However, as even without the exclusion of the March 2001 AUV from the calculations, Plaintiff's sale price was over [    ] more than the yearly average, the Court does not find the error important.

[5]The invoice price was [    ] per kilogram, but Customs deducted certain non-dutiable charges, making the AUV for Plaintiff's sale to Company X [    ] per kilogram. See POR Glycine Imports from China, Attach. 1 to Bona Fide Memo, CR Doc. No. 39 (Aug. 8, 2003).

in conformity with the benchmark of other Chinese glycine producers' sales into the market, Commerce also looked to see what prices Plaintiff charged for the same product in third-country markets. Commerce found evidence of another sale by Plaintiff during the period of review ("POR") to a third-country importer. See October 10, 2001 Invoice, Spot Checks of Other Sales, Ex. 7 to CR Appendix 1. In this sale, Plaintiff charged [    ] per kilogram for pharmaceutical grade glycine, an amount in line with the AUV. Id.[6] Accordingly, Commerce found that Plaintiff's price was out of line with both the benchmark of other Chinese exporters' sales of glycine to the United States, and with Plaintiff's own pricing practice as it applied to third-country sales. Bona Fide Memo, CR Doc. No. 39 at 3-4 (Aug. 8, 2003). Commerce therefore concluded that the price was not one which would be typical Plaintiff's future sales into the United States. See id.

Plaintiff challenges this finding with a variety of arguments. Briefly listed, Plaintiff's arguments on the price factor are: (i) that Commerce cannot reconcile a finding that its price was too high for bona fide purposes with its finding that Plaintiff should be accorded a 43.44% dumping margin, (ii) that the AUV data were not reliable because they included sales of all forms of Chinese

---

[6]Commerce also found evidence of a sale to a different third-country for the same price, but this sale was made outside the POR. See August 14 Invoice, Payment Training, Ex. 14 to CR Appendix 1.

glycine, and not just the pharmaceutical grade glycine that Plaintiff sold to Company X, (iii) that Company X's pricing data provide a more reliable benchmark than the AUV data, (iv) that to the extent the AUV data provide a reliable benchmark, they do so in a different way from that expounded by Commerce, (v) that the fact that Company X resold the goods for a profit establishes that the price was commercially sound, (vi) that Plaintiff's product was "granular" glycine and thus commanded a higher price than other pharmaceutical grade glycine, and (vii) that third-country sales reflected different market considerations and different grades of glycine.  The Court will discuss each argument in turn.

(i) <u>Plaintiff's argument that Commerce cannot reconcile a finding that its price was too high for bona fide purposes with its finding that Plaintiff should be accorded a 43.44% dumping margin is waived.</u>

Plaintiff argues that Commerce cannot reconcile a finding that its price was too high for <u>bona fide</u> purposes with its finding that Plaintiff should be accorded a 43.44% dumping margin.  <u>See</u> Pl.'s Conf. Br. at 14. Commerce did not address this contention in its <u>Bona Fide</u> Memo, or in its Remand Determ.  Commerce's omission is hardly surprising, as Plaintiff did not make this particular contention at the administrative level.  <u>See generally</u> Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re: <u>Glycine from the PRC; Remand Rebuttal Info and Comments</u>, CCR Doc. No. 3 (Jan. 14, 2004); Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L.

Evans, Sec'y of Commerce, Re: <u>Glycine from the PRC; Comments on Draft Results of Determination Pursuant to Court Remand</u>, CCR Doc. No. 8 (April 13, 2004).

Therefore, the Court finds that the argument is waived. Any possible contradiction between Commerce's pre-rescission finding that Plaintiff should be assessed a dumping margin of 43.44% and Commerce's later determination that Plaintiff's sale was non-<u>bona fide</u> because of its high price was apparent at the time of the rescission.  Plaintiff's argument was therefore available and open to it as of the time of rescission.  Moreover, although the record was reopened for the sole purpose of allowing the parties to comment on evidence that Commerce relied upon to demonstrate that the sale price was not commercially reasonable, Plaintiff never advanced this particular contention until briefing before the Court.  "If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."  <u>See</u> <u>McDonnell Douglas Corp. v. U.S. Dep't of the Air Force</u>, 375 F.3d 1182, 1187-88 (D.C. Cir. 2004) (quoting <u>Walter O. Boswell Mem'l Hosp. v. Heckler</u>, 749 F.2d 788, 792 (D.C. Cir. 1984)).  Plaintiff may not, at this late date, to present Defendant, and this Court, with new arguments that were better made below.[7]

---

[7]Even to the extent such an argument was not waived, it is highly unpersuasive. The "all others" rate for the antidumping order on glycine from China is over 155%.  <u>Glycine from the</u>

(ii) <u>Plaintiff's argument that the AUV data were not reliable because they included sales of all forms of Chinese glycine, and not just the pharmaceutical grade glycine that Plaintiff sold to Company X is waived.</u>

Plaintiff argues that the AUV data are not a reliable

indication of what a commercially reasonable price for Plaintiff's

---

<u>People's Republic of China</u>, 60 Fed. Reg. 16,116, 16,116 (Dep't Commerce Mar. 29, 1995) (antidumping duty order).  Commerce found that Plaintiff's individual dumping margin should be 43.44%.  <u>See</u> <u>Glycine from the People's Republic of China</u>, 68 Fed. Reg. 13,669, 13,672 (Dep't Commerce Mar. 20, 2003) (notice of preliminary results of antidumping duty new shipper review).  Commerce, in effect, found that while Plaintiff was dumping, it was dumping far less than other Chinese producers; that is, rather than being "too low," its price was far higher than many other Chinese producers' prices.  The <u>bona fide</u> analysis also found that Plaintiff's price was high.  <u>See</u> <u>Bona Fide</u> Memo, CR Doc. No 39 at 3-4 (Aug. 8, 2003); Remand Determ., CCR Doc. No. 13 at 17 (Apr. 23, 2004).  In this case, the combination of a high "all others" rate and the Plaintiff's high price compared to other import prices could mean two things: either Plaintiff truly means to replicate the high price sale upon which it predicated the review, or, Plaintiff will take advantage of one high price sale to secure a lower-than-average dumping margin, and then typically charge a far lower price (low enough to undercut the competition that has a higher dumping margin, but still high enough to make a hefty profit which would otherwise be unavailable). Considering that the latter is a far more profitable avenue, and that, because of the extended timelines of antidumping reviews, Plaintiff could have more than two years to enjoy an extremely advantageous, and possibly predatory, market position predicated entirely on an atypical sale, the weight of the evidence is in Commerce's favor in holding that the scenario above is likely indicative of an atypical, or non-<u>bona fide</u>, sale.  <u>See</u> Pl.'s Conf. Br. at 9, 18 (describing Plaintiff as "a profit maximizer" and appearing to admit that Plaintiff was in fact dumping by not accounting for various factors of production in its export price).  Moreover, given that the dumping margin calculation and the <u>bona fide</u> analysis address different concerns, there is nothing inherently contradictory in Commerce's finding that a price was low enough to be dumped, and yet so high when compared to other prices in the U.S. market as to be unlikely to be sustained in the future, especially where the motives for not sustaining the price are so clear.

product might be, because the AUV data includes all grades and forms of glycine, whereas Plaintiff only sells pharmaceutical grade glycine, which is more refined, and hence, more expensive to produce. See Pl.'s Conf. Br. at 16-18, Pl.'s Conf. Reply Br. at 7. In response, Commerce first points to the fact that the AUV data represent all sales of glycine from China into the United States during the POR, that they cover importation of over 100 metric tons of glycine, and that, therefore, the data provide a large sample that enables Commerce to have confidence that the prices represented in the AUV data are representative of prices for Chinese glycine during the POR. See Remand Determ., CCR Doc. No. 13 at 16-17 (Apr. 23, 2004). Commerce acknowledges that the AUV data represent sales of all grades of glycine, but notes that in its analysis of Plaintiff's factors of production, the total value of the labor, energy, and materials needed to produce the pharmaceutical grade glycine was [    ] per kilogram, only [    ] of which was attributable to the processes needed to refine the glycine from industrial grade to pharmaceutical grade. See id. at 17-18. Even were Commerce to add this amount, [    ], to the yearly AUV average of $2.27,[8] Plaintiff's sale price would still be

---

[8]Commerce, in its Remand Determ., does not specifically state that adding [    ] to the AUV for the POR would compensate for the expenses of pharmaceutical grade glycine, but Plaintiff argues that this is what Commerce means for the reader of the determination to do. See Remand Determ, CCR Doc. No. 13 at 18 (Apr. 23, 2004); Pl.'s Conf. Br. at 17-18.

significantly higher than the average yearly price.  See id. at 18.

Although Plaintiff does not appear to have argued this point before Commerce, see generally Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re: Glycine from the PRC; Remand Rebuttal Info and Comments, CCR Doc. No. 3 (Jan. 14, 2004); Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re: Glycine from the PRC; Comments on Draft Results of Determination Pursuant to Court Remand, CCR Doc. No. 8 (April 13, 2004), Plaintiff now challenges the notion that adding the specified amount, [    ], to the AUV is sufficient, arguing that the amount, [    ], only accounts for extra labor, energy, and materials, and does not take into account other factors of production, such as factory overhead, selling, general, and administrative expenses, and profit.  See Pl.'s Conf. Br. at 17-18.

The Court holds that the argument is waived.  Commerce first analyzed the increased costs associated with producing pharmaceutical grade, rather than industrial grade, glycine in its draft remand results.  See Draft Results of Determination Pursuant to Court Remand, CCR Doc. No. 7 at 10-11 (Apr. 9, 2004).  Plaintiff was able to submit comments on this draft, and in fact did so.  See Letter from Francis J. Sailer, Lafave & Sailer LLP, to Hon. Donald L. Evans, Sec'y of Commerce, Re: Glycine from the PRC; Comments on Draft Results of Determination Pursuant to Court Remand, CCR Doc.

No. 8 (April 13, 2004). It failed, however, to take exception to the government's calculation.[9] See id. Again, the Court will not entertain arguments that were not made before the agency when the Plaintiff had a clear opportunity to make them on the record.

_____

[9]To the extent this argument was not waived, Plaintiff's contentions do not help it achieve its desired result. In essence, Plaintiff argues that Commerce did not include in its calculation all the factors of production which should have been included to account for the refining process. See Pl.'s Conf. Br. at 17. Commerce's calculation results in enlarging the AUV by [    ]; under Plaintiff's calculation, [    ] should be added, resulting in a figure that makes Plaintiff's export price appear more reasonable. See id. at 17-18. Nonetheless, even assuming, as Plaintiff would, that the AUV data represent only industrial grade glycine and that all the factors Plaintiff proffers should be accounted for, Plaintiff's price exceeds the AUV data by approximately [    ]. See id. Moreover, Plaintiff's argument rests on the supposition that the AUV represents nothing but industrial grade glycine. See id. at 18. There is no evidence on the record by which Plaintiff has shown that this is actually the case. See Remand Determ., CCR Doc. No. 13 at 17 n.2 (Apr. 23, 2004) (admitting that the AUV includes "various grades of glycine"). On the contrary, the Harmonized Tariff Schedule of the United States ("HTSUS") does not distinguish between glycine of different grades; therefore, it would appear that Customs does not keep records as to what grades of glycine are imported. See subheading 2922.49.4020, HTSUS (2003). Thus, the record does not reveal what proportion of the AUV data represents industrial grade glycine and what proportion represents food or pharmaceutical grade glycine. See Remand Determ., CCR Doc. No. 13 at 17. The fair inference is that there is a mixture of the two. It is hardly likely that the demand for pharmaceutical grade glycine in the United States is so small that Plaintiff's shipment represented the entire universe of such imports during the POR. It is just as reasonable, in fact, to assume that only pharmaceutical grade glycine was shipped, and that, therefore, there is no reason to add anything at all to the AUV. In such case, Plaintiff's price exceeds the AUV by approximately [    ]. See Remand Determ., CCR Doc. No. 13 at 17. The actual percentage likely falls somewhere in between. Only one thing remains clear: no matter how the AUV data is manipulated to account for differences in grade, Plaintiff's price remains above the AUV, and is likely higher above the AUV than Plaintiff claims.

(iii) <u>Company X's pricing data does not provide a more reliable benchmark than the AUV data.</u>

Plaintiff argues that even to the extent that the AUV data have some measure of reliability, they should have been discounted in favor of a more reliable indicator of the market price of glycine: five invoices from Company X. <u>See</u> Pl.'s Conf. Br. at 19-20; Pl.'s Conf. Reply Br. at 7. Plaintiff argues the price at which Plaintiff sold its goods was typical of the price that Company X paid for similar goods during the POR. The evidence shows that Company X paid at least [   ] per kilogram for domestically sourced glycine purchased during the POR. <u>See</u> Ex. A. to Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re: <u>Glycine from the PRC; Remand Rebuttal Info and Comments</u>, CCR Doc. No. 3 (Jan. 14, 2004). Moreover, because these were invoices for purchases of glycine of a similar grade to Plaintiff's, Plaintiff argues that they are more reliable overall than the AUV data, which included various grades of glycine. <u>See</u> Pl.'s Conf. Br. at 20; Pl.'s Conf. Reply Br. at 7.

Commerce argues in response that four invoices from a single purchaser of glycine do not represent a large enough sample for Commerce to be sure that these prices accurately reflect typical glycine transactions. <u>See</u> Remand Determ., CCR Doc. No. 13 at 16-17. Moreover, Commerce argues that it has no means by which to evaluate these invoices so as to determine their reliability. <u>Id.</u> The Court agrees with Commerce. While the invoices from Company X

may be sufficient to show how a typical future domestic sale to Company X might be priced, there is no reason for Commerce to believe that all of Plaintiff's future sales would be to Company X or that, indeed, Company X represents a typical customer. Company X might be selling glycine in a niche market where higher prices dominate, or buying in comparatively small amounts, and therefore paying a higher price. While, as Plaintiff contends, these invoices might be probative of the price that Company X is willing to pay, see Pl.'s Conf. Br. at 20, they cannot tell Commerce or this Court much, if anything, about how much other domestic purchasers of glycine are willing to pay. Certainly they do not go as far as the AUV data in showing the typical U.S. price for Plaintiff's product.

(iv) <u>The AUV data provide a reliable benchmark in the manner expounded by Commerce.</u>

Plaintiff argues that to the extent the AUV data provide a reliable benchmark, they do so in a different way from that expounded by Commerce. See Pl.'s Conf. Br. at 21; Pl.'s Conf. Reply Br. at 5-6. Specifically, Plaintiff alleges that the AUV data should be disaggregated by month, because this would show that Plaintiff's price was within the range of the individual monthly AUVs. See id. Plaintiff alternatively argues that its sale should only be compared with the AUVs of months with similar volumes of sales, contending that months with smaller volumes "reflect FOB

prices at a spot basis (as compared to a generic, long-term basis)
likely more reflective of a few individual transactions than other
months in which 'larger' volumes consisting of multiple shipments
of various different grades of product were imported." Remand
Determ. at 19-20 (quoting Letter from Francis J. Sailer, Lafave &
Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re:
Glycine from the PRC; Comments on Draft Results of Determination
Pursuant to Court Remand, CCR Doc. No. 8 at 8 (April 13, 2004));
see also Pl.'s Conf. Br. at 21, n.61; Pl.'s Conf. Reply Br. at 6 &
n.17.

On the first count, Commerce argues that to disaggregate the
monthly AUVs would amount to "cherry-picking" the data, and would
therefore be contrary to Shanghai Foreign Trade Enters. Co. v.
United States, slip op. 04-33 (CIT Apr. 9, 2004). See Remand
Determ., CCR Doc. No. 13 at 18 (Apr. 23, 2004). Commerce also
argues that the yearly average "smooths out" monthly variations and
allows for a more reliable figure covering a longer period of time
and a greater volume of merchandise. Id. Finally, Commerce notes
that even were it to consider only data for the month in which
Plaintiff's product was imported, once Plaintiff's shipment is
eliminated from the data for that month, the resulting AUV for that
month was [    ] per kilogram, over a [    ] less than Plaintiff's
selling price. Id. Commerce argues that this differentiates the
instant case from Fresh Garlic from the People's Republic of China,

68 Fed. Reg. 11,368 (Dep't Commerce Mar. 10, 2003) (notice of amended final results of antidumping duty administrative review), in which a sale was held to be <u>bona fide</u> when it was shown to be in line with the AUV data for both the entire POR and the month of importation. <u>See</u> <u>id.</u> at 19. As to Plaintiff's argument on comparing months of similar volumes, Commerce argues that Plaintiff's FOB contention is pure speculation, and that no record evidence was introduced to suggest that larger volume months do not reflect spot basis sales, that glycine companies other than Plaintiff ship in similar volumes, or that larger volume months necessarily indicate dissimilar grades of glycine. <u>See</u> <u>id.</u> at 19-20.

The Court agrees with Commerce that disaggregation of the data is not required. Larger sample sizes are generally preferable when the goal is, as here, to generalize from a sample to a population, because the larger the sample, the less risk run that the sample chosen is extreme or unusual simply by chance. <u>See, e.g.</u>, Laurence C. Hamilton, <u>Data Analysis for Social Scientists</u> 203 (Duxbury Press, 1996) ("Larger samples permit more precise estimates of unknown population parameters . . . a larger sample is always better"). Plaintiff's arguments ignore this fundamental rule of statistics without providing any evidence beyond mere speculation for the contention that months with lower volumes reflect spot basis sales containing similar grades of glycine. Commerce cannot

be required to disaggregate the data without a more substantive basis for Plaintiff's claim. Without such a basis, disaggregation on Commerce's part would violate the long-standing rule that administrative agency determinations must evince "a rational connection between the facts found and the choices made." See Shanghai Foreign Trade Enters. Co. at 13 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1968). Moreover, Commerce is correct in stating that, even were Commerce to only compare Plaintiff's sale price with the prices of other imports entered in the same month, once Plaintiff's sale is removed from that data, what remains is a monthly AUV of [    ], which is still over [        ] less than Plaintiff's price. See Remand Determ., CCR Doc. No 13 at 18.

> (v) The fact that Company X resold the goods for a profit does not establish that the price was commercially sound.

Plaintiff alleges that the fact that Company X resold the goods for a profit establishes that the price was commercially sound. See Pl.'s Conf. Br. at 14-15; Pl.'s Conf. Reply Br. at 2. Commerce, in turn, acknowledges that the merchandise was resold at a profit, although not at such a large one as Plaintiff initially alleged. See Remand Determ., CCR Doc. No. 13 at 17. Commerce does not address the argument further, resting on its other evidence suggesting that the sale was unusually priced. See id.

The Court agrees with Commerce's implicit contention that a profit on resale cannot establish the bona fides of the sale where

there is other evidence suggesting that the sale is not bona fide.

Company X's profits on the sale may indicate that the particular

price agreed upon was not such as to be utterly uncommercial, or

that the two companies were not colluding to arrive at it;

nonetheless, the existence of a profit does not provide significant

evidence of whether the sale price is typical for the market as a

whole, or for Plaintiff's future practice in particular.  It is

true that a non-profit making price would likely invalidate a new

shipper sale as atypical for the market.  See Am. Silicon Techs. v.

United States, 24 CIT 612, 616, 110 F. Supp. 2d 992, 996 (2000);

see also Certain Cut-to-Length Carbon Steel Plate from Romania, 63

Fed. Reg. 47,232, 47,234 (Dep't Commerce Sept. 4, 1998) (rescission

of antidumping duty administrative review).  Sales made at a loss,

in normal circumstances, could reasonably be viewed as likely not

being market-price sales.  But the converse – a profit-enabling

price - is not an automatic basis for conferring typicality upon

the sale.  Consequently, resale at a profit is not the alpha and

omega of a bona fide analysis.

> (vi) The record does not contain substantial evidence to show
> that Plaintiff's product was "granular" glycine and thus
> commanded a higher price than other pharmaceutical grade
> glycine.

Plaintiff contends that the glycine it sold to Company X was

granular, and therefore commands a higher price than powdered

glycine of a similar grade. See Pl.'s Conf. Br. at 15. Commerce

notes that there was no evidence to substantiate the claim that granular glycine is more expensive than powdered glycine.  See Remand Determ., CCR Doc. No. 13 at 18 (Apr. 23, 2004).

The Court agrees that the record does not contain substantial evidence to demonstrate that granular glycine was more expensive than powdered glycine.  Commerce here somewhat overstated its point in saying that there was no record evidence to that effect, see id. 18, when in fact Company X averred in a questionnaire response that Plaintiff's "granular powder" glycine has a bigger market and better quality than "fine powder" glycine purchased from other companies. See Pl.'s Conf. Br. at 15; Glycine From PRC A-570-836; Questionnaire Response, CR Doc. No. 22 at para. 7 (Mar. 12, 2003). However, no other evidence on the record supports the existence of "granular powder" glycine, as differentiated from "fine powder" glycine.  Plaintiff has put forth no evidence specifically stating the price differences incurred in creating this "granular powder" or suggesting that purchasers of glycine are typically willing to pay a premium for such a good.  Accordingly, Company X's single statement is insufficient to refute Commerce's finding that the amount by which Plaintiff's price exceeded the AUV and its own third-country practice cannot be accounted for by the expenses associated with "granular powder" glycine.

(vii) Plaintiff's third-country sales reflected different market considerations and different grades of glycine.

Plaintiff argues, albeit briefly, that its third-country

prices were not evidence of its future pricing practices, and hence not relevant.  See Pl.'s Conf. Br. at 19; Pl.'s Conf. Reply Br. at 9. Plaintiff alleges that there is no reason to believe that the third-country sales were of pharmaceutical grade glycine, and that the absence of dumping orders on Chinese glycine in the third-country markets means that the pricing in those countries is dissimilar to what would be typical of its U.S. price.  Id. Plaintiff did not appear to take issue with the third-country data before the agency, despite it having been mentioned in the Draft Remand Results.  See Draft Results of Determination Pursuant to Court Remand, CCR Doc. No. 7 at 11 (April 9, 2004); see also Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, Re: Glycine from the PRC; Comments on Draft Results of Determination Pursuant to Court Remand, CCR Doc. No. 8 (April 13, 2004).  Before the Court, Commerce responds to Plaintiff's argument, stating that there was no evidence on the record suggesting that the market conditions in the third-countries were significantly different from those in the U.S. Def.'s Conf. Br. at 17-18 (citing to Anshan Iron & Steel Co. v. United States, slip op 03-83 (CIT July 16, 2003).

    The Court agrees that there is no reason to discount the third-country data.  First, Plaintiff waived this argument when it did not bring it up before the agency.  Second, while it might be possible to show that the third-country markets and the U.S. market

were significantly different, no evidence to support that contention appears on the records. Finally, contrary to Plaintiff's supposition, Commerce found at least two third-country invoices for pharmaceutical grade glycine, see Pl.'s Conf. Br. 19, one of which showed that Plaintiff had priced the identical product at [    ] per kilogram during the POR, an amount in line with the AUV. See October 10, 2001 Invoice, Spot Checks of Other Sales, Ex. 7 to CR Appendix 1; August 14, 2002 Invoice, Payment Training, Ex. 14 to CR Appendix 1. Accordingly, the Court finds that (i) Plaintiff's argument that there is an inherent contradiction between the margin calculation and the bona fide analysis is waived, (ii) that even when the AUV is adjusted to account for different grades of glycine, Plaintiff's price is still comparatively high, (iii) that despite its flaws, the AUV data is a more reliable benchmark than Company X's five invoices, (iv) that the AUV data was best viewed in the aggregate, and not in disaggregation, (v) that the mere fact that Company X resold the product at a profit does not answer the question of whether the transaction was typical for the market, (vi) that Plaintiff's evidence that it sold "granular" glycine, and thereby commanded a premium is insufficient to rebut Commerce's finding that Plaintiff's price was too high (vii), that third-country sales were relevant to the determination and demonstrated that Plaintiff had priced the product in a manner more reflective of the AUV data

during the POR.  Moreover, the Court agrees with Commerce that the evidence in the record demonstrates that Plaintiff's price was neither in line with prices in the U.S. market nor with Plaintiff's third-country pricing.  Accordingly, the Court finds that substantial evidence supports Commerce's determination that the Plaintiff's price indicated that its sale was not a typical sale for the U.S. market and would not be predictive of future sales.

**2.  SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S DETERMINATION THAT THE PAYMENT TIMING OF THE SALE SUPPORTED A FINDING THAT THE SALE WAS ATYPICAL**

In addition to finding that the price of Plaintiff's sale was such that future sales were unlikely to be similarly priced, Commerce also found that the payment timing involved in Plaintiff's sale did not reflect commercial reality.  See Remand Determ., CCR Doc. No. 13 at 29-30 (Apr. 23, 2004).  Commerce found that the terms of sale required payment within 30 days of the invoice date of January 25, 2002.  Bona Fide Memo, C.R. Doc. No. 39 at 4-5 (Aug. 8, 2003).  However, payment was not actually made until nine months later.  Id. at 5.  Moreover, Commerce could find no evidence that any attempt at collection had been made on Plaintiff's part until November 1, 2002.  Id. at 6. While Commerce found that Company X had been late in making payments to Plaintiff before, it had never failed to make payment for such a long period of time.  See Remand Determ., CCR Doc. No. 13 at 29 (Apr. 23, 2004).  Moreover, Commerce

found that Company X continued to make payments to Plaintiff for other sales.  Id.  Commerce found that allowing payment to go uncollected departed from "normal, commercial" business practices. Bona Fide Memo, CR Doc. No. 39 at 6 (Aug. 8, 2003).

Plaintiff argues that the record evidence demonstrates that Company X had long engaged in a "regular commercial pattern" of failing to pay in a timely manner, but that payment was always eventually received.  Letter from Francis J. Sailer to the Hon. Donald L. Evans, Sec'y of Commerce, Re: Glycine from the PRC; Comments on Draft Results of Determination Pursuant to Court Remand, CCR Doc. No. 8 at 13-14 (April 13, 2004); see also Pl.'s Conf. Br. at 23.

Plaintiff points out that during verification, it stated that it had several times made telephone contact with Company X in an attempt to collect payment. See Pl.'s Conf. Br. at 23.  Moreover, at least one other customer had been as late as Company X in making payment, lending credence to the idea that allowing late payments was part of Plaintiff's normal commercial practice. See id.  To further its argument before Commerce, Plaintiff cited Certain Cold Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea, 64 Fed. Reg. 12,927, 12,929 (Dep't Commerce Mar. 16, 1999) (final results of antidumping duty administrative reviews), claiming that it is not unusual for respondents in dumping cases to receive late payments, and not to receive recompense for such late

payment.  See Letter from Francis J. Sailer to the Hon. Donald L. Evans, Sec'y of Commerce, Re: Glycine from the PRC; Comments on Draft Results of Determination Pursuant to Court Remand, CCR Doc. No. 8 at 14-15 (Apr. 13, 2004).  However, in its briefs before the Court, Plaintiff now cites instead to a memorandum written in conjunction with Certain Preserved Mushrooms from the People's Republic of China, 68 Fed. Reg. 10,694, 10,696 (Dep't Commerce Mar. 6, 2003) (preliminary results and partial rescission of the fourth new shipper review and preliminary results of the third antidumping duty administrative review).  See Pl.'s Conf. Br. at 24.  Plaintiff argues that this memorandum stands for the proposition that late payment timing alone is not enough to demonstrate that a sale was atypical and therefore non-bona fide.  See id.  Finally, Plaintiff argues that to the extent that Plaintiff received payments from Company X in a more timely fashion in the past, these sales had been made by Plaintiff's U.S. subsidiary, whereas the sale at issue was made directly from China.[10]  See id. at 23-24.

While the Court agrees with Plaintiff that this late payment on its own might not be enough to support a finding of a non-bona fide sale, the late payment here accompanies a price that is

---

[10]Prior to the draft remand results, it appears that Plaintiff argued that Company X did not timely pay because it did not have available funds. See Remand Determ., CCR Doc. No 13 at 26 (Apr. 23, 2004).  However, Plaintiff appears now to have waived this argument, as it is addressed neither in Plaintiff's comments subsequent to the draft remand results, or in its briefs to the Court.

inconsistent with the U.S. market, with Plaintiff's own practice, and which is unlikely to repeat itself.  Thus, while the evidence on payment timing may be supportive rather than primary in the bona fide analysis undertaken here, the issue is not irrelevant or unsuggestive.  Moreover, to the extent that the issue of payment timing could support Commerce's finding that the sale at issue here was non-bona fide, it does so here.

It is undisputed on the record that Company X did not make payment until nine months after the invoice date.  See  Pl.'s Conf. Br. at 23.  While Company X had made late payments to Plaintiff before, none of its former payments were as late as this. Plaintiff argues that these other payments were made more timely because they were on sales made by a U.S. subsidiary, "which presumably has a regular procedure for following up with customers," rather than directly by Plaintiff's Chinese headquarters.  Id.  Although it could be true that "follow-up may be more difficult from China," id. at 24, such speculation does not pass as evidence.

Finally, as regards Plaintiff's citation to a memorandum accompanying Certain Preserved Mushrooms from the People's Republic of China, 68 Fed. Reg. 10,694, 10,696 (Dep't Commerce Mar. 6, 2003) (preliminary results and partial rescission of the fourth new shipper review and preliminary results of the third antidumping duty administrative review) ("Certain Preserved Mushrooms"), Plaintiff has not provided that memorandum to the Court and the

Court has been unable to find it. See App. of Docs. Cited in Br. of Pl. Supp. of Its R. 56.2 Mot. J. Agency. R.  Nevertheless, the Court has located the issues and decision memorandum accompanying the final results of that antidumping duty new shipper review. See Memorandum to Joseph A. Spetrini, Acting Assistant Sec'y, from Jeffrey May, Deputy Assistant Sec'y for Imp. Admin., Re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty New Shipper and Administrative Reviews on Certain Preserved Mushrooms for the People's Republic of China – February 1, 2001 through January 31, 2002, (July 11, 2003), available at http://ia.ita.doc.gov/frn/summary/prc/03-17628-1.pdf  ("Mushroom Memo"). The second issue presented by that memorandum relates to the bona fides of a new shipper, Shenzhen Qunxingyuan. Id. at 1. Petitioners noted that the payment on the new shipper's sole sale into the United States did not occur until six months after the sale.  Id. at 16.  While acknowledging that this argument had been made, Commerce did not cite it as part of its determination that the sale was non-bona fide, resting instead on other factors that the agency found of greater significance.[11]  Id. at 17. This does not reflect, however, on the issue's importance here.  As Commerce put it in the issues and decision memorandum in Certain Preserved

---

[11]Indeed, in Certain Preserved Mushrooms, there was strong evidence to suggest that not only was the sale itself non-bona fide, but that the company that made it was entirely fictitious. Mushroom Memo at 20.

Mushrooms, "[w]hile some bona fides issues may share commonalities across various Department cases, each one is company-specific and may vary with the facts surrounding each sale." Mushroom Memo at 20.

Given the unusual sale price involved, it was not unreasonable for Commerce to look beyond the price to determine whether other characteristics of the sale were such as to demonstrate that the sale as a whole, was atypical. Late payment may be such an aspect, especially where the payment is so late. In this case, Plaintiff has demonstrated that at least one other customer has been delinquent for a comparable amount of time, and that its customer in this sale, Company X, has also been late in paying before. However, Company X has never been quite this late, while Plaintiff has little evidence to suggest that it was assiduous in its efforts at collection. These factors provide a reasonable basis for the conclusion that this sale was viewed by both parties as outside their normal business practice. Accordingly, Commerce had substantial evidence to consider the payment timing as a factor that counseled against a finding that the sale was typical, representative, and therefore bona fide.

**3.  SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S DETERMINATION THAT INCONSISTENCIES IN THE IMPORT DOCUMENTATION OF THE SALE SUPPORTED A FINDING THAT THE SALE WAS ATYPICAL**

The third factor that Commerce cited to in support of its

determination that the sale was non-<u>bona fide</u> relates to inconsistencies in the import documentation accompanying the goods when they entered the United States. <u>See</u> Remand Determ., CCR Doc. No. 13 at 30, 33 (Apr. 23, 2004). Company X, the importer in this transaction, filed with Customs a copy of Customs Form 7501 in which it stated that the goods were listed as "Entry Type 1, "free and dutiable," rather than subject to antidumping duties. <u>See</u> <u>id.</u> at 30 (Apr. 23, 2004); Entry Summary, Ex. A-4 to Response of Tianjing Tiancheng Pharmaceutical Corp. Ltd. and its Supplier to Section A of the Department's Antidumping Questionnaire, Attachment to Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, CR Doc. No. 3 (July 11, 2002). Company X also marked that the rate of antidumping duties owed on the goods was "Free" rather than 155.89 %. <u>See</u> Remand Determ., CCR Doc. No 13 at 31 (Apr. 23, 2004); Entry Summary, Ex. A-4 to Response of Tianjing Tiancheng Pharmaceutical Corp. Ltd. and its Supplier to Section A of the Department's Antidumping Questionnaire, Attachment to Letter from Francis J. Sailer, Lafave & Sailer LLP, to the Hon. Donald L. Evans, Sec'y of Commerce, CR Doc. No. 3 (July 11, 2002). In its questionnaire responses, Company X indicated that its customs broker did not know the details of the antidumping order when it filed the form, and that Company X was working with Customs to sort out the error. <u>See</u> Glycine from PRC (A-570-836); Questionnaire Response, CR Doc. No.

35 at Answer 2 (July 17, 2003).

Commerce argues that, where Plaintiff predicates its new shipper review on the bona fides of this sale, Plaintiff has no excuse for failing to inform its customer of the antidumping duty due on the sale. See Remand Determ., CCR Doc. No. 13 at 32-33 (Apr. 23, 2004). The fact that it did not suggests, at least under Commerce's argument, that Plaintiff was seeking to manipulate the terms of the sale so as to receive a lower margin than it would obtain under a sale made under more typical circumstances. See id. at 33. Commerce also appears to argue that it is unusual, at least, for Company X to employ a customs broker who, by its own admission, was unaware of antidumping orders on glycine when Company X was, as it stated "in the business of importing and reselling glycine." See Def.'s Br. at 24 (quoting Glycine from PRC A-570-836; Questionnaire Response, CR Doc. No. 22 at Answer 1 (Mar. 12, 2003)).

Plaintiff states that it has no control over the import documentation that its importer filed, and that therefore this error cannot be used to demonstrate that it entered into the sale in a manner inconsistent with its typical practice. See Pl.'s Conf. Br. at 25. Moreover, Plaintiff notes that Company X correctly coded the goods for their proper tariff classification; because the goods were properly classified, Plaintiff claims that there is little reason to believe that Company X was actively

trying to avoid paying antidumping duties.  Id. at 25-26.
Plaintiff also argues that there is no "rational connection"
between the fact that dumping duties were not paid and the
conclusion that the sale is atypical or non-bona fide, id. at 26,
and points out that Commerce concluded that this factor, were it to
stand alone, would not be sufficient to demonstrate that the sale
was atypical for purposes of the bona fide analysis.  Id. at 27.

    The Court agrees with both Plaintiff and Commerce that, were
this factor to stand alone, it would not be substantial evidence
for the proposition that the sale was non bona fide.  However, this
evidence, in this case, does not stand alone.  Rather, it is one,
small factor that weighs against a finding that the sale was bona
fide.  Divorced from the larger context of the review, the evidence
on this issue could be said to point in either direction: to a
simple mistake, as Plaintiff alleges, or to some collusive endeavor
to manipulate the sale, as Commerce alleges.  However, Commerce has
already established that the price and payment timing of the sale
were unusual.  It is also somewhat unusual that no antidumping
duties would be paid. Therefore, there is at least some rational
connection between a finding that duties were not paid and a
finding that the sale was atypical.

    In disavowing a duty to inform Company X of the duty
applicable to the goods, Plaintiff appears to be forgetting that
this sale was to serve a very special purpose – as the predicate of

a new shipper review.  Plaintiff never alleges that it informed its customer as to the fact of the duties, or that their existence formed part of the sales negotiations.  Had they done so, it would buttress the claim that a mistake was made, and that this mistake should not reflect at all on the conditions of Plaintiff's sale. Plaintiff was, of course, under no obligation to place this information into the record or make such an argument here. However, as the record stands, with an unusual sales price and atypical payment timing, the record evidence cuts both ways: Commerce could have reasonably and rationally decided the point in either direction.  This does not mean that there is not substantial evidence for the direction Commerce did take.  The mere fact that two inconsistent conclusions could be drawn from a piece of evidence does not render an agency's decision unsupported by substantial evidence.  <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966) (citations omitted).

Accordingly, the Court finds that substantial evidence supports Commerce's finding that the import documentation factor supported the overall finding that the sale at issue was atypical, and hence, non-<u>bona fide</u>.

**4.  SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S DETERMINATION THAT THE SALE WAS NON-<u>BONA FIDE</u>**

Commerce found, on the basis of the three factors discussed above, that Plaintiff's sale was not <u>bona fide</u> for purposes of the

new shipper review.  Plaintiff argues that, even to the extent the three factors weigh against Plaintiff, the factors do not add up to substantial evidence demonstrating that the sale was non-<u>bona fide</u>. <u>See</u> Pl.'s Conf. Br. at 27.  In support of its argument, Plaintiff cites to various other circumstances surrounding the sale, such as the fact that the sale was at arm's length, and that the sale was for a commercial quantity, that there was no unusual transportation of the shipment (such as air, rather than sea transport), and that a profit was earned on resale.  <u>See</u> Pl.'s Conf. Br. at 28.

Commerce argues that while a single sale is not inherently commercially unreasonable, the fact that only one sale was made will be taken into account in Commerce's <u>bona fide</u> analysis.  <u>See</u> <u>Bona Fide</u> Memo, CR Doc. No. 39 at 2 (Aug. 8, 2003).  In one-sale reviews, there is, as a result of the seller's choice to make only one shipment, little data from which to infer what the shipper's future selling practices would look like.  This leaves the door wide to the possibility that the sale may not, in fact, be typical, and that any resulting antidumping duty calculation would be based on unreliable data.  <u>See</u> Remand Determ., CCR Doc. No. 13 at 7, 34 (Apr. 13, 2004).

Commerce also argues that the <u>bona fide</u> analysis involves consideration of the totality of the circumstances regarding the sale.  <u>See</u> Remand Determ., CCR Doc. No. 13 at 34 (Apr. 13, 2004). The inquiry, then,  consists not merely of a checklist of factors,

in which if six factors are found unusual and seven are found to be typical, the new shipper's sale as a whole is found typical. Rather, the weight given to each factor investigated will depend on the circumstances surrounding the sale.

The Court agrees with Commerce. While a single sale is not inherently commercially unreasonable, Windmill Int'l Pte., Ltd. v. United States, 26 CIT 221, 231, 193 F. Supp. 2d 1303, 1313 (2002), it will be carefully scrutinized to ensure that new shippers do not unfairly benefit from unrepresentative sales.  See Memorandum from Richard W. Moreland, Deputy Assistant Sec'y, Group I, to Faryar Shirzad, Assistant Sec'y for Imp. Admin., Re: Issues and Decision Memorandum: New Shipper Review of Clipper Manufacturing Ltd., available at http://ia.ita.doc.gov/frn/summary/prc/02-6076-2.txt (incorporated by reference into Fresh Garlic from the People's Republic of China, 67 Fed. Reg. 11,283 (Dep't Commerce Mar. 13, 2002) (final results of antidumping duty administrative review and rescission of new shipper review.)

In this case, the sale price was shown to be both atypical of the market as a whole, and of Plaintiff's own prices.  Therefore, the price factor has significant weight, and cannot necessarily be offset by a recitation of other factors by which the sale could be considered typical, such as the fact that the shipment term (CIF) was normal for this type of transaction.  See Pl.'s Conf. Br. at 28.  The transaction must be "normal" as a whole, and price must be

a large part of what produces "normal" sales in the context of an antidumping determination.

Accordingly, the Court finds that substantial evidence supports Commerce's conclusion that the totality of the circumstances surrounding the sale supported a finding that the sale was non-<u>bona fide</u>.

**CONCLUSION**

The Court finds that substantial evidence demonstrates that the price, payment timing, and import documentation surrounding the sale at issue were all unusual with regard to the U.S. market, Plaintiff's own practice, and good business practice generally. The Court also finds that all three factors supported a conclusion that the sale was unlikely to be a good future indicator of Plaintiff's future sales in the market. Accordingly, Plaintiff's motion is denied and judgment entered for the Defendants.

                                    /s/ Donald C. Pogue
                                      Donald C. Pogue
                                           Judge

Dated:  New York, New York
        March 9, 2005

ERRATUM


Tianjin Tiancheng Pharmaceutical Corp. v. United States, Slip Op. 05-29, March 9, 2005, Court No. 03-00654:

Page 1: The caption should read "Court No. 03-00654," not "Consol. Court No. 03-00654."

March 10, 2005